**Craig SLOAN and Karen Sloan,
Plaintiffs–Appellants,**

**v.**

**The METROPOLITAN HEALTH COUNCIL OF INDIANAPOLIS, INC., d/b/a Metro–Health Plan, Defendant-Appellee.**

No. 30A01–8706–CV–00151.

Court of Appeals of Indiana,
First District.

Dec. 23, 1987.

---

Thomas J. Young, Peter D. Shumacker, Thomas J. Young & Associates, Indianapolis, for plaintiffs-appellants.

L. Alan Whaley, Ice, Miller, Donadio & Ryan, Indianapolis, for defendant-appellee.

NEAL, Judge.

## STATEMENT OF THE CASE

Plaintiffs-appellants, Craig Sloan and Karen Sloan (the Sloans), suffered an adverse

summary judgment rendered by the Hancock Superior Court in favor of the Metropolitan Health Council of Indianapolis, Inc., d/b/a Metro–Health Plan (Metro), in their suit for malpractice.

We reverse.

## STATEMENT OF THE FACTS

The evidentiary material before the trial court in its consideration of Metro's motion for summary judgment was as follows. Metro is a not-for-profit corporation organized to provide a prepaid health care delivery plan, or, as it terms itself, a health maintenance organization, and it is regulated under IND.CODE 27–8–7–1 to –21. Metro's members pay a monthly charge, plus certain specified fees listed in a schedule; in return, they are entitled to specifically enumerated medical services. Metro advertises one complete system which delivers its members health care in return for prepaid payment. The member selects one of Metro's staff physicians, who then treats the member, orders tests, prescribes medicine, or arranges for other professional care or hospitalization. It boasts of simplicity: one medical office, one phone number, and one medical record for each member. Metro physicians are on call 24 hours a day, every day, for emergencies involving members. All complaints are made to Metro, not to physicians. Enrollment in the plan is with Metro, not the physician. Billing is made by Metro, not the physician, and Metro has the right of subrogation.

The physicians who treat members are engaged by Metro by a written contract denominated as an "employment contract," wherein Metro is labeled the "Employer" and the physician is called the "Physician." The Physician is paid an annual salary, increased yearly and paid in biweekly installments, in addition to which he receives such fringe benefits as sick leave, life, health, and malpractice insurance, a tax-sheltered annuity, vacation pay, and professional leave. The Physician cannot engage in outside work without Metro's consent.

Important here are the following clauses:

1. *Employment.* The Physician is hereby employed to engage in and carry on the practice of medicine and to insure that prompt and impartial medical diagnosis and treatment are given to all members of the Employer's Metro–Health Plan and to such other patients as are registered at the Employer's health facilities.

Although the Medical Director is primarily responsible to see that the medical services required under contracts between the Employer and the Employer's Metro–Health Plan members are carried out, the Physician while on duty will be responsible for the supervision and administration of the health services at the health facilities.

The Physician acknowledges that the Medical Director shall determine all medical policy matters and the Medical Director's judgment, in the event of a dispute, shall be final. It is also understood that the Medical Director shall use his best efforts to periodically review policy matters with the Physician so that policies and administrative procedures developed by the Employer shall result from the collective ideas of all parties involved.

The Physician agrees that he will execute the labors of his employment in a professional manner and will conduct himself in such a way as shall serve the best interests of the Employer, the Plan and the Plan members. The Physician will assure that the following objectives, by way of illustration but not by way of limitation, are implemented:

(a) sole utilization of problem-oriented medical records

(b) a team approach to health care, utilizing nurses, physician extenders and other para-professionals

(c) emphasis on ambulatory and preventive health care

(d) development and implementation of a regular internal assessment of quality of health care

(e) development and fostering of the total concepts of prepaid health care

\*　　\*　　\*　　\*　　\*　　\*

6. *Relationship Between Parties.* The Physician, although responsible for medical decisions, agrees to cooperate with the Employer and to allow the Employer to make all other non-medical decisions, and agrees to accept and share the concept of health care delivery described in the Principles of Practice which are attached hereto, made a part hereof, and marked for identification as "Principles of Practice."

*Record* at 521, 523. The medical director referred to is Maurice Kaufman, a medical doctor. The principles of practice referred to, in addition to the recital of idealistic goals, contain the following pertinent clauses:

C. To accept as one of their fundamental duties the periodic review of the quality of medical care given to the enrollees of the Plan

D. To allow [Metro], from time to time, in consultation with the medical staff, to engage outside medical authority to conduct medical audits of the Plan's medical program

*Record* at 526. The bylaws provide:

*Medical Audit Committee.* This Committee shall establish a program to insure that medical services of high quality are delivered to enrollees.

*Record* at 342. Metro is a federally qualified health maintenance organization under Title XIII of the Public Health Service Act, 42 U.S.C. § 300e. The Sloans, members of Metro since 1978, brought suit alleging a negligent failure to diagnose. In its affidavit filed in support of its motion for summary judgment, Metro claims that the physicians it employs are independent in their practice of medicine, and Metro does not control their judgment in diagnosis or treatment decisions. Physicians are reviewed periodically as a matter of quality assurance, they are not overseen for the purpose of questioning their conclusions, and Metro does not enjoy veto power over tests, diagnoses, prescriptions, or treatment.

The trial court granted summary judgment to Metro on the basis that a corporation cannot be vicariously liable for the malpractice of a physician in its employment. The sole question here is the correctness of that ruling.

## DISCUSSION AND DECISION

Our standard of review in an appeal from a summary judgment is well established. We ascertain whether the pleadings, affidavits, answers to interrogatories, responses to requests for admission, and depositions, when read in the light most favorable to the non-moving party, reveal any genuine issues of material facts, and if not, whether the trial court correctly applied the law. *Shallenberger v. Scroggins–Tomlinson, Inc.,* (1982), Ind.App., 439 N.E.2d 699. In performing our function of review we stand in the position of the trial court and consider the same matters as it does. *Moll v. South Central Solar Systems Inc.* (1981), Ind.App., 419 N.E.2d 154.

■ Metro supports the trial court's ruling with reliance upon the case of *Iterman v. Baker* (1938), 214 Ind. 308, 15 N.E.2d 365, and its progeny, consisting of *South Bend Osteopathic Hospital, Inc. v. Phillips* (1980), Ind.App., 411 N.E.2d 387, *trans. denied; Ross v. Schubert* (1979), 180 Ind.App. 402, 388 N.E.2d 623, *trans. denied; Huber v. Protestant Deaconess Hospital* (1957), 127 Ind.App. 565, 133 N.E.2d 864, *trans. denied*; and *Fowler v. Norways Sanitorium* (1942), 112 Ind.App. 347, 42 N.E.2d 415, *trans. denied.*

*Iterman* was a malpractice case against the New Castle Clinic, a corporation owned by physicians who were the directors, officers, and employees. The corporation owned the building and equipment, collected the fees, and paid the physicians a salary. Baker consulted Dr. Iterman who, with the consultation of two other employee-physicians, diagnosed and treated him. There was no reference in the doctor-patient relationship to a contract with the corporation. The court denied recovery as a matter of law. Its rationale is stated as follows:

The complaint is upon the theory that the corporation was engaged in practicing medicine and surgery, and that it contracted to diagnose and treat the ap-

pellee's injury. The right to practice medicine is, in this state, controlled by statute. It is held in some jurisdictions that corporations may legally engage in the practice of medicine and surgery. *The question involves the consideration and construction of local statutes. Under the statutes of this state it has never been doubted that it is unlawful for a corporation to practice medicine, and any contract made in the name of a corporation, binding it to diagnose or treat ailments or diseases, is not only ultra vires, but unlawful and against public policy.* The right to practice medicine and surgery under a license by the state is a personal privilege. It cannot be delegated, and a corporation, or other unlicensed person may not engage in the practice of medicine by employing one who is licensed to do the things which constitute practicing the profession. *State v. Williams* (1937), 211 Ind. 186, 5 N.E.2d 961. If a licensed physician employs assistants, who work under his direction as assistants, in the practice of medicine or surgery, the *respondeat superior* rule applies. But a licensed physician may not accept directions and instructions in diagnosing and treating ailments from a corporation or an individual who is not a licensed practitioner. (Emphasis added.)

214 Ind. at 316–17, 15 N.E.2d at 369–70.

The court stated that if a contract for medical services was made with a corporation the contract would be complied with by using reasonable and ordinary care to employ qualified, reputable, and licensed physicians. In such cases the physicians or surgeons are independent contractors. The corporation is not estopped to assert the defense because all persons are presumed to know the law that a corporation cannot practice medicine.

*Iterman* was followed in *Huber. Fowler* followed *Iterman,* but held that a corporation hospital could be vicariously liable for ministerial acts, as contrasted to medical decisions. *Phillips* held that administering a prescribed injection was ministerial. *Ross* held that physicians employed on a part-time basis by International Harvester Company to treat employees were not such fellow employees as would afford immunity from a malpractice suit under the Workmen's Compensation Act.

The entire rationale for the holding in *Iterman* is based upon the conclusion reached by the court that, since no Indiana statute existed at that time which permitted a corporation to practice medicine, a public policy existed prohibiting a corporation to practice medicine; thus, the doctrine of *respondeat superior* was inapplicable. We believe that the Professional Corporation Act of 1983, IND.CODE 23–1.5–1–1 to –5–2, totally abolished such a public policy if, indeed, it ever existed. We acknowledge that Metro is not incorporated under the Professional Corporation Act, but the Act stands as a pronouncement of public policy concerning a corporation's vicarious liability for the acts of its employee-physician. We are mindful that no statute existed at the time of *Iterman* which expressly forbade a corporation to practice medicine, but the pronouncement in *Iterman* was a court-created rule based upon legislative silence.

Under the Professional Corporation Act a physician is a health care professional. IND.CODE 23–1.5–1–8(7). Professional service is service by a health care professional. IND.CODE 23–1.5–1–11(4). IND. CODE 23–1.5–2–3(a)(4) then provides:

A professional corporation may be formed to render professional services only as follows:

One (1) or more health care professionals may form a professional corporation to render services that may legally be performed only by a health care professional.

Liability of the corporation is provided in IND.CODE 23–1.5–2–6(c):

A corporation whose employees perform professional services within the scope of their employment or of their apparent authority to act for the corporation is liable to the same extent as its employees.

and IND.CODE 23–1.5–2–7(b):

The relationship between a professional corporation performing professional

services and the client or patient is the same as between the client or patient and the individual performing the services.

*Birt v. St. Mary Mercy Hospital of Gary, Inc.* (1977), 175 Ind.App. 32, 370 N.E.2d 379 is instructive. In *Birt,* a medical malpractice suit was brought in an attempt to impose liability vicariously upon a non-treating physician who was also a member of a professional medical corporation organized under IND.CODE 23-1-14-1.[1] The court, in denying recovery, stated:

Apprehension has also been expressed concerning the ability of an injured patient to collect a damage award without the existence of vicarious liability. Again, however, we believe the fear is overstated. Of course, the malpracticing physician is liable to the extent of his personal assets and such malpractice insurance as he, or the corporation may possess. In addition, it is beyond question that the corporate entity is liable for malpractice committed by one of its members. *See, e.g., Lenhart v. Toledo Urology Associates, Inc.* (1975), 48 Ohio App.2d 249, 356 N.E.2d 749; *Zimmerman v. Hogg & Allen* (1974), 22 N.C. App. 544, 207 S.E.2d 267, *rev. on other grounds,* 286 N.C. 24, 209 S.E.2d 795.

*Id.* at 40, 370 N.E.2d at 383. Though dicta, the last sentence of the quotation is an illustration of the change in public policy.

Finally, the case of *Estate of Mathes v. Ireland* (1981), Ind.App., 419 N.E.2d 782, *trans. denied,* is more on point. In *Mathes* a dangerously ill mental patient confined in the care of a psychiatric center was released, after which he caused harm. In its defense the center urged the application of *Iterman.* The court, in a review of the authorities, stated:

Secondly, we are urged that the centers cannot be found liable upon the basis of negligent acts which may have been committed by psychiatrists or psychologists employed by them. In support the centers refer us to *Iterman v. Baker* (1938), 214 Ind. 308, 15 N.E.2d 365 in which our Supreme Court held that a hospital was not liable for the acts of

physicians and surgeons who bore the relationship of independent contractor to the hospital.

In the present appeal it is sufficient answer to note that the complaint broadly alleged negligence on the part of the centers' "staff" or "duly authorized personnel." If under these allegations the plaintiff can establish negligence on the part of regular employees in the performance of their regular duties under the supervision and control of the center, liability may be established. *Fowler v. Norways Sanitorium* (1942), 112 Ind. App. 347, 42 N.E.2d 415.

In addition, however, we are unable to accept the centers' assertion that *Iterman* precludes their liability in any event for the actions of staff psychiatrists and psychologists for the reason that the centers themselves cannot be licensed to perform these services.

It is quite true that in *Iterman* the court stated as one ground for its holding that a hospital corporation by statute was prohibited from practicing medicine. But it did so on the facts before it because the complaint was stated upon the theory that the hospital corporation *was* engaged in the practice of medicine and that it had contracted to diagnose and treat Baker's injury. 214 Ind. 308, 15 N.E.2d at 369.

To that claim it was germane and reasonable to point out that a corporation could not secure a license to practice medicine; that indeed public policy opposed it. It is, however, a non sequitur to conclude that because a hospital cannot practice medicine or psychiatry, it cannot be liable for the actions of its employed agents and servants who may be so licensed. Similar logic would dictate that a city cannot be liable for the negligence of its employees in driving automobiles since the city cannot hold a driver's license or that a corporation cannot be liable for the misactions of its house counsel since it could not [sic] hold a license to practice law.

---

1. This statute was replaced by the Professional Corporation Act.

We have no quarrel with the *Iterman* recognition that many physicians may hold staff privileges at one or more hospitals and that merely by treating a patient at a given hospital they do not thereby render the hospital liable on the basis of respondeat superior for some act of malpractice they may commit. Under such circumstances the proper question is whether they are an independent contractor or an employee. However, we find no logical basis for denying liability under proper circumstances on the ground that the professional must exercise a professional judgment that the principal may not properly control. The general rule of liability that presupposes *authorization* of acts of the agent in order to bind the principal applies to a principal's contractual or *non-tort* liability. *See, e.g.,* 3 Am.Jur.2d *Agency* § 261, p. 627. The *tort* liability of the principal expressed in the doctrine of respondeat superior is based not upon the agency relationship (authorization or ratification) but upon the employer-employee relationship. Thus, the touchstone of the principal's liability for the tortious acts of his agent is merely whether they are done within the course and scope of the employment. *Pittsburgh C.C. & St. L. Ry. Co. v. Sullivan* (1894), 141 Ind. 83, 40 N.E. 138; *Miller v. Long* (1956), 126 Ind. App. 482, 131 N.E.2d 348, *reh. denied* 126 Ind.App. 482, 132 N.E.2d 272. *See also* 3 Am.Jur.2d *Agency* § 267, p. 631. 419 N.E.2d at 785–86. We read *Mathes,* which the supreme court let stand, as a departure from *Iterman.* Its logic is undeniable.

As shown by the statement of facts, there is evidence that Metro's staff physicians were under the control of its medical director, a physician, who policed medical services and established policy. His judgment was final. The circumstances establish an employment relationship where the employee performed acts within the scope of his employment. The employee-physician was supervised by a physician, not a layperson, an objection voiced in *Iterman.* We are of the opinion that, upon the advent of the Professional Corporation Act, a public policy no longer exists in Indiana shielding medical corporations from malpractice liability of their employee physicians. *Mathes* reflects the new approach. No statutory scheme exists to abolish the doctrine of respondeat superior for medical corporations regardless of whether the corporation is a professional corporation or not. *Iterman* is no longer applicable. The practice of medicine by Metro is, according to the facts, exactly the same as the practice of medicine by a professional corporation. We see no reason why Metro should be exempt from the doctrine of respondeat superior while professional corporations are not. Metro cannot escape the operation of the doctrine by the simple expedience of not incorporating under the Professional Corporation Act. Should we succumb to Metro's argument that it is not incorporated under the Professional Corporation Act, and therefore, the rules governing that entity are not applicable, we would be required to take the next step and hold that the entire operation was illegal. We hold that where the usual requisites of agency or an employer-employee relationship exist, a corporation may be held vicariously liable for malpractice for the acts of its employee-physicians.

For the above reasons this cause is reversed, and the trial court is directed to overrule Metro's motion for summary judgment.

Judgment reversed.

RATLIFF, C.J., and GARRARD, P.J., concur.